UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JACQUELINE CARMENATTY ROLON,  :
                         :CIVIL ACTION NO. 3:18-CV-0229
          Plaintiff,    :
                         :(JUDGE CONABOY)
          v.          :
                         :
NANCY A. BERRYHILL,       :
Acting Commissioner of     :
Social Security,         :
                         :
          Defendant.    :

---

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the Acting Commissioner's denial of Disability Insurance Income ("DIB") under Title II of the Social Security Act ("Act"). (Doc. 1.) Plaintiff protectively filed her application on July 8, 2014, alleging disability beginning on June 20, 2013. (R. 10.) After Plaintiff appealed the initial September 30, 2017, denial of the claim, a hearing was held by Administrative Law Judge ("ALJ") Richard E. Guida on June 8, 2016. (*Id.*) ALJ Guida issued his Decision on September 19, 2017, concluding that Plaintiff had not been under a disability as defined in the Social Security Act ("Act") from June 20, 2013, through the date of the decision. (R. 24.) Plaintiff requested review of the ALJ's decision which the Appeals Council denied on December 5, 2017. (R. 1-6.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 1.)

Plaintiff filed this action on February 2, 2018. (Doc. 1.) She asserts in her supporting brief that the Acting Commissioner's

determination should be reversed or remanded for the following reasons: 1) the ALJ erred in evaluating the opinion evidence; and 2) the ALJ erred in his symptom evaluation. (Doc. 8 at 1.) For the reasons discussed below, the Court concludes Plaintiff's appeal is properly granted.

## I. Background

Plaintiff was born on March 6, 1970, and was forty-three years old on the alleged disability onset date. (R. 23.) Plaintiff has a high school education and past relevant work as a customer service representative. (R. 23.) In the July 21, 2014, Disability Report, Plaintiff alleged that her ability to work was limited by fibromyalgia, depression, anxiety, sleep apnea, and arthritis. (R. 155.)

Plaintiff's claimed errors focus on the opinions of treating physician David Trostle, M.D., and fibromyalgia, the condition for which Dr. Trostle treated Plaintiff. (Doc. 8 at 8-17.) The Court will focus on evidence related to this condition and discuss other relevant evidence in the discussion of the claimed errors.

### A. *Fibromyalgia Evidence*

Plaintiff testified that she stopped working on June 20, 2013, because she was no longer allowed to work part-time and her only option was full-time work which she could not handle because of her health and stress. (R. 39-40.) Plaintiff said she did not look for other work at the time because of pain, stress, and depression,

and her husband wanted her to stay home.  (R. 40.)  When asked by the ALJ which of her diagnoses (fibromyalgia, depression, anxiety, sleep apnea, headaches, arthritis, chronic back pain, and hypertension) bothered her the most, Plaintiff identified fibromyalgia and the associated pain.  (R. 41.)  She described the pain as constant and rated it as nine out of ten on a daily basis. (R. 43.)

David Trostle, M.D., of Lebanon Internal Medicine Assoc., PC, was Plaintiff's long-term treating physician for fibromyalgia and related problems.  (*See*, *e.g.*, R. 237-330.)  In December 2012, Plaintiff saw him for follow up of her fibromyalgia and osteoarthritis.  (R. 295.)  Dr. Trostle noted that Plaintiff rated her pain at 4/10 and she said it was improved from her previous visit.  (*Id.*)  She reported that it was worse with activity and better with heat and rest.  (*Id.*)  Dr. Trostle also noted Plaintiff was known to have bulging discs in her neck, a herniated disc in her back, and a bulging disc in her midback.  (*Id.*)  He added that insurance had denied an MRI scan for her neck and back and Plaintiff did not have the money for insurance co-pays to go to physical therapy but she was trying to do her exercises.  (*Id.*) Physical exam showed Plaintiff had eighteen of eighteen positive fibromyalgia tender points, she was tender in the paracervical and paralumbar regions, hips and knees, she was tender in the right wrist, and she was very tender over the triangular cartilage with

mild swelling there.  (*Id.*)

On May 8, 2013, Plaintiff reported to Dr. Trostle that her pain was worse (rated at 5/10) and Lyrica, Cymbalta, and ibuprofen helped her some.  (R. 301.)  Plaintiff's physical exam findings were similar to those recorded in December 2012, but Dr. Trostle also found she had moderate paracervical and parathoracic spasm as well as depressed reflexes in the upper extremities and 1+ in the lower extremities.  (*Id.*)  Dr. Trostle planned to refer Plaintiff to physical therapy for her neck and back and he adjusted her medication regimen.  (*Id.*)  Regarding her right wrist problem, Dr. Trostle planned to refer Plaintiff to Dr. Hauck to see if anything more could be done for her chronic pain in that area.  (*Id.*)  He also planned to reevaluate Plaintiff in a few months.  (*Id.*)

At her October 15, 2013, office visit, Plaintiff continued to report pain at 5/10 severity.  (R. 304.)  Dr. Trostle noted that Plaintiff "has failed Lyrica" and reported that she did not think Cymbalta or ibuprofen helped her.  (*Id.*)  He indicated Dr. Hauck injected her right wrist area which helped as did the TENS unit which she said helped "quite a bit."  (*Id.*)  Physical exam again showed 18/18 fibromyalgia tender points and tenderness in the paracervical and paralumbar regions, hips, and knees.  (*Id.*)

In June 2014, Plaintiff reported worsening pain (6/10) and also said the TENS unit helped as did heat and rest.  (R. 312.)  In addition to 18/18 fibromyalgia tender points, Dr. Trostle found

4

that Plaintiff was very tender in her shoulders, lower back, hips, knees and neck. (*Id.*) He reported that she had a positive McMurray sign in the left knee, mild weakness in the right arm, and depressed reflexes in the right biceps compared to the left biceps. (*Id.*) Dr. Trostle noted that Plaintiff did yoga and foam rolling for her firbromyalgia and he had put her back on Lyrica, added metaxalone, and she was to continue taking Aleve. (R. 312.)

In July 2014, Plaintiff complained of increasing widespread arthralgias, stiffness, and fatigue, and she continued to rate her pain as 6/10. (R. 326.) Dr. Trostle added Neurontin to Plaintiff's medication regimen. (*Id.*)

In December 2014, Plaintiff had worsening back pain which she rated as 7/10. (R. 356.) She reported that she had been doing her physician-directed exercise program but it had not helped. (*Id.*) Dr. Trostle noted that insurance would not pay for Cymbalta. (*Id.*) Physical examination showed the following: tenderness in the paralumbar and parathoracic regions with mild to moderate loss of motion in the lower back; 12/18 positive fibromyalgia tender points; tender in the medial joint lines of both knees; tender in the neck; mild weakness in her right leg; depressed reflexes on the right; and decreased sensation to light touch in the L5-S1 distribution on the right. (*Id.*) Dr. Trostle adjusted Plaintiff's medication regimen and planned to get her into a formal physical therapy program. (*Id.*)

In 2015, Plaintiff showed periodic slight improvement in the level of joint pain she experienced with a decrease from 7/10 in August to 5/10 in October. (R. 364, 371.) She continued to have 12/18 to 18/18 positive fibromyalgia tender points and tenderness with some right shoulder loss of motion and crepitus. (R. 365, 370.)

On referral of Dr. Trostle for aquatic/physical therapy to address generalized limited range of motion and pain, Plaintiff had an Initial Examination/Evaluation at Good Samaritan Hospital Outpatient Physical Therapy Service on November 2, 2015. (R. 442.) Regarding her level of functioning, Plaintiff reported the following: she was managing in her home but with progressive difficulty; and she had trouble getting out of her car, getting a full night's sleep and sitting for prolonged periods of time secondary to back and neck pain, standing for prolonged periods of time, climbing stairs, driving, lifting, and managing household responsibilities. (*Id.*) Numerous problems were identified: decreased cervical range of motion; decreased thoraco-lumbar range of motion; decreased shoulder range of motion particularly rotation, left greater than right; decreased hip strength bilaterally; lack of full extension of the knnes; difficulty with prolonged standing or walking; difficulty with transfers, particularly in and out of her car; and difficulty finding comfortable positions for sleep. (R. 443.) Long term goals which

were set initially (R. 444) were only partially achieved at the time of discharge in late December 2015 (R. 462).  The Discharge Summary indicated the reasons the goals had not been achieved were that they were set too high and Plaintiff had an ingrown toenail which needed treatment.  (R. 462-63.)

Plaintiff testified that she thought the therapy ended because she had the number of weeks "due . . . with the insurance."  (R. 48.)  She also said it was not helping her at all.  (*Id.*)  Plaintiff noted that she still had the limitations identified at the physical therapy evaluation at the time of the June 2016 hearing.  (*Id.*)

On January 12, 2016, Plaintiff reported to Dr. Trostle that her joint pain was a little worse, up to 7/10 in severity.  (R. 686.)  Plaintiff complained of severe fatigue, stiffness for an hour when she got up in the morning, poor sleep patterns, and pain in her jaw.  (*Id.*)  Physical exam showed tenderness in the paralumbar region, pain on five degrees of extension and forty degrees of flexion, she lacked ten degrees of lateral rotation and ten degrees of extension of her neck, and she had 18/18 positive fibromyalgia tender points.  (*Id.*)  Dr. Trostle noted that he encouraged Plaintiff to get in to see psychiatry or her primary doctor to get her anxiety and depression under better control.  (R. 687.)  Dr. Trostle also noted "I did ask her to apply for disability as I think her depression and pain is too great for her

to be working." (*Id.*)  Dr. Trostle found multiple tender areas on January 29, 2016, and noted that Plaintiff's pain remained the same.  (R. 689.)

Dr. Trostle again found 18/18 positive fibromyalgia points in May 2016.  (R. 714.)  He noted Plaintiff was tender in the neck and lower back, she had moderate loss of motion of the neck and lower back, and she was tender in the medial joint lines of both knees. (*Id.*)

## B. Opinion Evidence

Dr. Trostle rendered opinions on January 1, 2016.[1]  (R. 552-66.)  In the Fibromyalgia Residual Functional Capacity Questionnaire, Dr. Trostle noted that he had seen Plaintiff every three months since July 22, 2006, and she met the American College of Rheumatology criteria for fibromyalgia.  (R. 557.)  He identified generalized osteoarthritis as another diagnosed impairment and opined that Plaintiff's prognosis was fair.  (*Id.*) Dr. Trostle found that Plaintiff's impairments were clinically supported by widespread tender points and x-rays and MRI showed disc deterioration and osteoarthritis.  (*Id.*)  He noted Plaintiff had the following symptoms: multiple tender points, nonrestorative

---

[1]  In the Arguments section of her brief, Plaintiff asserts that the ALJ improperly discounted the opinions of Dr. Trostle and her treating psychiatrist, Dr. Dall.  (Doc. 8 at 8.)  However, in her argument supporting the claimed error, Plaintiff addresses only Dr. Trostle's opinions.  (*See* Doc. 8 at 8-13.)  Therefore, the Court reviews only Dr. Trostle's opinions.

sleep; chronic fatigue; morning stiffness; subjective swelling; irritable bowel syndrome; frequent, severe headaches; temporomandibular joint dysfunction; numbness and tingling; Sicca symptoms; anxiety; panic attacks; depression; and chronic fatigue syndrome. (*Id.*) Dr. Trostle indicated that Plaintiff had pain in all identified areas bilaterally with 8/10 severity and dull/aching character. (R. 558.) He found the factors precipitating pain were changing weather, stress, fatigue, movement/overuse, and cold. (*Id.*) Dr. Trostle opined that Plaintiff's pain and other symptoms would constantly interfere with the attention and concentration needed to perform work tasks and she was incapable of even low stress jobs. (*Id.*) He specifically found the following: Plaintiff could walk one block without rest or severe pain; she could sit for two hours and stand for one hour at a time; she could sit and stand/walk for a total of about two hours each in an eight-hour workday; she would need a job that permitted shifting positions at will; she would need to take a break every hour; she could never lift fifty pounds, occasionally lift twenty pounds and frequently lift ten pounds or less; she could rarely twist, stoop, crouch/squat, climb ladders, and climb stairs; she could occasionally look down, turn her head, look up, and hold her head in a static position; and she could use her hands, fingers, and arms 10% of the time for identified manipulative and reaching

activities.[2]  (R. 559-60.)  He opined that Plaintiff would have mostly bad days and she would be absent more than four days per month.  (R. 560.)  Dr. Trostle identified July 22, 2006, as the earliest date the description of symptoms and limitations on the questionnaire applied.  (*Id.*)

In the Cervical Spine Residual Functional Capacity Questionnaire, Dr. Trostle indicated "significant limitation of motion" including extension, flexion, and bending limitations.  (R. 562.)  Dr. Trostle noted that Plaintiff had severe headache pain associated with the cervical spine impairment which occurred about ten times per week.  (R. 563.)  He made similar findings in the Physical Residual Functional Capacity Questionnaire.  (*See* R. 552-56.)

## C.   *ALJ Decision*

In his September 19, 2016, Decision, ALJ Guida found that Plaintiff had the severe impairments of degenerative disc disease, degenerative joint disease, fibromyalgia, migraines, obesity, anxiety disorder and depressive disorder.  (R. 12.)  He concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.  (*Id.*)  ALJ Guida specifically determined that

---

[2]  Dr. Trostle identified specific reaching, handling, and fingering limitations although he checked "No" to the question of whether his patient had significant limitations with these activities.  (R. 560.)

Plaintiff had mild to moderate limitations regarding criteria set out in "paragraph B" of the identified mental impairment listings. (R. 13-14.)

ALJ Guida then assessed Plaintiff to have the residual functional capacity ("RFC") to perform light work "except [she] can perform occasional postural activities but can never climb ladders, ropes, or stairs.  She is limited to occasional overhead reaching with the dominant (right) extremity.  Further, work is limited to simple, routine, repetitive tasks, involving only simple work-related decisions, and with few, if any workplace changes."  (R. 15.)

After noting that Plaintiff could not perform her past relevant work as a customer service representative, ALJ Guida concluded that jobs existed in significant numbers in the national economy which she could perform.  (R. 23.)  He, therefore, found that Plaintiff had not been under a disability as defined in the Act from June 20, 2013, through the date of the decision.  (R. 24.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[3]  It is necessary for the

---

[3]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of

only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that jobs existed in significant numbers in the national economy which Plaintiff could perform.  (R. 23.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of

13

> evidence will not satisfy the substantiality
> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence. Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion. *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted). The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted). If he has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative

14

evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where a claimed error would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

As set out above, Plaintiff asserts the Acting Commissioner's

15

determination should be reversed or remanded for the following reasons: 1) the ALJ erred in evaluating the opinion evidence; and 2) the ALJ erred in his symptom evaluation. (Doc. 8 at 1.)

## A. *Opinion Evidence*

Plaintiff asserts the ALJ erred when he discounted the opinions of Plaintiff's treating physician, Dr. Trostle. (Doc. 8 at 8.) Defendant maintains the ALJ properly evaluated opinion evidence. (Doc. 11 at 7.) The Court concludes Plaintiff has shown the claimed error is cause for remand.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.[4] *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)). Sometimes called the "treating physician rule," the principle is codified at 20 C.F.R. § 404.1527(c)(2), and is widely

---

[4] Though not applicable here, the regulations have eliminated the treating source rule for claims filed after March 27, 2017, and in doing so have recognized that courts reviewing claims have "focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our decision." 82 FR 5844-01, 2017 WL 168819, *at 5853 (Jan. 18, 2017). The agency further stated that in its experience in adjudicating claims using the treating source rule since 1991, the two most important factors for determining persuasiveness are consistency and supportability, which is the foundation of the new regulations. *Id.* Therefore, the new regulations contain no automatic hierarchy for treating sources, examining sources, or reviewing sources, but instead, focus on the analysis of these factors. *Id.*

accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986). The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).[5] "A cardinal principle

_____

[5] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); *see also Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

Dr. Trostle's opinions are the only physical impairment opinion evidence reviewed by ALJ Guida (*see* R. 20) and are the only acceptable medical source opinions of record regarding physical impairments.[6] ALJ Guida concluded Dr. Trostle's opinions were

---

[6] The Disability Determination Explanation contains a Physical Residual Functional Capacity Assessment from Michelle Tomkosky, SDM. (R. 71-72.) A single decision-maker ("SDM") is a non-examining, non-medical employee at the state agency level. *Yorkus v. Astrue*, No. Civ. A. 10-2197, 2011 WL 7400189, at *4 (E.D. Pa. Feb. 28. 2011). "Significant case law" and "the Agency's own policy" indicate that SDM RFC assessments are not to be accorded any evidentiary weight when an ALJ is deciding a case at the hearing level. 2011 WL 7400189, at *4 (listing cases and administrative documents).

entitled to little weight because his medical source statements

> appear to be based on the claimant's
> subjective allegations and are quite
> inconsistent with the objective medical
> records.  Reviewing Dr. Trostle's records,
> the examinations found the claimant's pain
> controlled with Lyrica and Effexor.  There
> was no indication that the claimant could sit
> for only two hours per day.  She did not
> report such limitations to Dr. Trostle
> (Exhibits 2F and 6F [R. 242-330, 345-75]).
> The radiographic studies did not support her
> allegations of arthritic pain and radiating
> pain to the legs, and the primary care and
> orthopedic examinations found greater
> functioning than Dr. Trostle opined.  For
> example, she walked with a normal gait
> (Exhibit 7F/2, 10, 16, 19, 27 [R. 376, 385,
> 391, 394, 402]).  She also did not report
> such significant limitations with sitting to
> the primary care provider (Exhibit 7F [R.
> 376-441]).  Further, Dr. Trostle indicated
> that these limitations began in July 2006.
> This is not supported by the claimant's work
> history in which she continued to work until
> June 2013 (Exhibit 11F [R. 557-61]), nearly
> seven years after Dr. Trostle indicated she
> would be unable to sit for more than two
> hours and to stand and walk for two hours and
> would miss four days of work per month.

(R. 20.)

In response to the ALJ's statement that Dr. Trostle's assessments are inconsistent with objective medical records, Plaintiff points to numerous diagnostic tests and clinical findings, including Dr. Trostle's records during the relevant time period which show "fibromylagia trigger points, tenderness in paracervical and paralumbar regions, right knee tenderness, depressed reflexes in the upper and lower extremities, mild

19

weakness in right arm, positive McMurray sign in the left knee."
(Doc. 8 at 10-11 (citing R. 301, 304, 312, 345, 349, 356, 370, 714).)  Dr. Trostle's records reviewed in the Background section above show that he regularly found numerous fibromyalgia-related problems on physical examination.  *See supra* pp. 2-8.  ALJ Guida does not discount the clinical findings recorded at numerous office visits during the relevant time period.  Nor does he discount the November 2015 physical therapy assessments that Plaintiff had decreased cervical range of motion; decreased thoraco-lumbar range of motion; decreased shoulder range of motion particularly rotation, left greater than right; decreased hip strength bilaterally; and lack of full extension of the knees.  (R. 443.) Thus, ALJ Guida's general statement that Dr. Trostle's assessments are "quite inconsistent with the objective medical records" without specific citation to the record is not supportive of his assignment of little weight to the opinions.

ALJ Guida's specific reasons for discounting Dr. Trostle's assessments are similarly deficient.  The ALJ's statement that Plaintiff's pain was controlled with Lyrica and Effexor does not reflect reports in Dr. Trostle's office records which indicate the medications were helpful at times but her pain remained at a level of 5/10 to 7/10.  (*See*, *e.g.*, R. 301, 326, 356, 364.) On May 8, 2013, Plaintiff reported to Dr. Trostle that her pain was worse (rated at 5/10) and Lyrica, Cymbalta, and ibuprofen helped

her some.  (R. 301.)  Finally, Dr. Trostle's references to Effexor relate primarily to Plaintiff's mental health where he noted that Effexor helped her depression.  (*See*, *e.g.*, R. 686, 689.)

ALJ Guida's reliance on the observation that Plaintiff did not report to Dr. Trostle that she could only sit for two hours a day is misplaced in that Dr. Trostle did not ask Plaintiff about her ability to sit and the ALJ points to no evidence suggesting that an office visit discussion of the matter would be expected or the lack thereof significant.  In other words, ALJ Guida appears to set a standard for what should have been discussed at an office visit that does not comport with the way medical office visits were conducted and what information was routinely sought from the patient.  Further, November 2015 physical therapy records indicated Plaintiff reported difficulty sitting for prolonged periods of time.  (R. 442.)  This report is contemporaneous with her treatment by Dr. Trostle (*see* R. 370, 686) and the physical therapy assessment was conducted on his referral with the results forwarded to him (R. 442, 445).  ALJ Guida's reliance on the fact that Plaintiff did not report sitting limitations to her primary care provider (R. 20) is flawed for the same reasons.

ALJ Guida next stated "[t]he radiographic studies did not support her allegations of arthritic pain and radiating pain to the legs" (R. 20) without identifying evidence supporting the assertion.  Because radiographic studies showed abnormalities (*see*,

*e.g.*, Doc. 8 at 10-11 (citing study results)) and, in addition to "widespread tender points," Dr. Trostle references x-rays and MRI studies as supportive of Plaintiff's impairments, ALJ Guida's contrary conclusion appears to be an improper "speculative inference[] from medical reports" which cannot provide a basis to reject a treating physician's opinion. *Morales*, 225 F.3d at 317. As *Morales* directs, the ALJ must show contradictory medical evidence and cannot rely on his own "credibility judgments, speculation or lay opinion." *Id.*

ALJ Guida also found "the primary care and orthopedic examinations found greater functioning than Dr. Trostle opined." (R. 20.) By way of example, the ALJ cites records which state that Plaintiff walked with a normal gait. (*Id.* (citing Ex. 7F/2, 10, 16, 19, 27 [R. 376, 385, 391, 394, 402]). The cited evidence is not "contradictory medical evidence" for several reasons: Dr. Trostle did not find otherwise regarding Plaintiff's gait; ALJ Guida does not present evidence which suggests the observation that Plaintiff walked with a normal gait precludes the limitations assessed by Dr. Trostle; a primary care provider notation which preceded the alleged onset date by more than six months is not indicative of functioning during the relevant time period (*see* R. 376); and observations about gait which are the sole notation on musculoskeletal exam recorded at primary care office visits precipitated by acute problems such as chest pain (R. 384, 385) or

suggested by Dr. Trostle for a specific reason such as high blood pressure (R. 390, 391) should not be considered of greater evidentiary weight than Dr. Trostle's detailed musculoskeletal examination findings (*see*, *e.g.*, R. 301, 312, 356), especially when the primary care provider recognized that Dr. Trostle was the treating physician for fibromyalgia (*see*, *e.g.*, R. 385, 391).

Finally, ALJ Guida's conclusion that Plaintiff's work history contradicts Dr. Trostle's assessed limitations (R. 20) does not provide the support suggested. The ALJ states "Dr. Trostle indicated that these limitations began in July 2006. This is not supported by the claimant's work history in which she continued to work until June 2013, . . . nearly seven years after Dr. Trostle indicated she would be unable to sit for more than two hours and to stand and walk for two hours and would miss four days of work per month." (R. 20.) First, Dr. Trostle did not establish a date certain for the onset of limitations. In answer to the question "What is the ealiest [sic] date the description of symptoms and limitations on the questionnaire applies?", Dr. Trostle wrote "7/22/06." (R. 560.) Because "earliest" means "the soonest date or time possible for something to be done or for something to happen,"[7] Dr. Trostle's response does not necessarily mean Plaintiff had all of the symptoms and limitations identified in the

---

[7] https://www.collinsdictionary.com/dictionary/english/earliest.

questionnaire on July 22, 2006--by definition, the symptoms and limitations described by Dr. Trostle could have commenced at some time *after* July 22, 2006. In other words, no definitive conclusion should be drawn from an arguably imprecise question. Second, as asserted by Plaintiff, a claimant's continuing effort to work despite limitations should not preclude a finding of disability. (Doc. 8 at 11 (citations omitted).) This is particularly true in this case because Plaintiff testified that she did not work full time in her customer service representative job with Comcast and she left the position because she did not think she could work full-time when the part-time option was eliminated because of her health and stress.[8] (R. 40.)

While Defendant cannot provide reasons to support the opinion assessment which the ALJ did not, *Fargnoli*, 247 F.3d at 42 (explicitly providing reasons for a decision is the ALJ's responsibility), the Court notes that Defendant's proffered reasons, if credited, would not change the Court's analysis. The lack of direct reference to limitations in office notes and test result consistency (*see* Doc. 11 at 9) were addressed above, as were indications that pain relief medications controlled Plaintiff's pain. Defendant's assertion that the TENS unit helped Plaintiff's

---

[8] ALJ Guida determined that Plaintiff was not able to perform her past relevant work because she was limited to performing one- to two-step tasks and her customer service job required multiple step tasks. (R. 23.)

pain (Doc. 11 at 9 (citing R. 304, 312)) is accurate but the cited records show that Plaintiff's pain remained at 5/10 to 6/10 in severity and musculoskeletal exam continued to show multiple tender points (as well as "very tender" areas), mild weakness, and some depressed reflexes (*id.*).  Defendant's statement that "Plaintiff's ability to engage in yoga and foam rolling is flatly inconsistent with Dr. Trostle's extremely limiting opinions" (Doc. 11 at 9-10) provides no basis for the inconsistency.  An individual can practice yoga at many levels and poses can be modified or adapted to meet the needs of the student, including those with disabilities and chronic health conditions.[9]  Foam rolling has stretching and massage uses which are not contraindicated when a person has fibromyalgia or osteoarthritis that limit mobility; rather, both massage and yoga have been found helpful in coping with the conditions.[10]

The foregoing review of the bases proffered as support for ALJ Guida's assignment of little weight to Dr. Trostle's opinions shows that his determination is not supported by substantial evidence. Therefore, this matter must be remanded for further consideration of the opinions with particular attention paid to the *Morales* directive that an ALJ may not make "speculative inferences from

---

[9]   *See* https://disabled-world.com/fitness/exercise/yoga.

[10]   *See, e.g.*, https://webmd.com/fibromyalgia/fibromyalgia-creating-treatment-plan; *see also* https://www.activebeat.com/fitness/get-rolling.

medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317.

## B. *Symptom Evaluation*

Plaintiff contends the ALJ erred in his evaluation of Plaintiff's symptoms: he did not state which of her symptoms he found consistent and/or inconsistent with the evidence; he did not properly assess pain symptoms, fibromyalgia, and daily activities; he made improper inferences about the nature of her treatment; and he improperly considered improvement in her condition. (Doc. 8 at 14-17.) Defendant responds that ALJ Guida appropriately evaluated Plaintiff's subjective complaints in that the ALJ recognized her testimony about limitations "was not supported by treatment records that show Plaintiff was in no acute distress, had no more than moderate pain that was relieved with medications and a TENS unit, had a normal gait, and had no difficulty walking or standing." (Doc. 11 at 14 (citing R. 16-18).) For the reasons discussed below, the Court concludes Plaintiff's symptoms should be reevaluated on remand.

Following his conclusion that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence of record, ALJ Guida set out evidence, and

occasionally interspersed comments regarding consistency and subjective assessments of the significance of the evidence cited. (R. 16-18.)  The ALJ specifically found that "the objective medical records do not support her allegations that she needs to lie down six hours per day and that she cannot walk more than two blocks before needing to rest."  (R. 16.)  The ALJ cited a pre-onset date examination by Dr. Trostle where Plaintiff reported improvement in her level of pain, however the cited record from December 2012 does not support the ALJ's assertion that Plaintiff's "severe pain improved to mild with routine and conservative treatment, which included Lyrica and Effexor, TENS unit, and exercise program."  (R. 16 (citing Ex. 2F/54 [R. 295]).)  The ALJ also cited a May 2013 examination by Dr. Trostle which showed muscle spasm and tenderness in the paracervical and paralumbar region, adding that "no difficulties with ambulation or range of motion were noted."  (R. 16 (citing Ex. 2F/60 [R. 301]).)  His review of the examination does not include Dr. Trostle's recording that Plaintiff's pain had worsened, she had 18/18 positive fibromyalgia tender points and she had depressed reflexes in her upper extremities.  (R. 301.) In general, ALJ Guida identified positive findings of improvement but does not explain how periodic improvement undermines Plaintiff's alleged symptoms of pain and limited mobility.  (*See* R. 16-20.)

ALJ Guida also points to inconsistency in Plaintiff's reports

of daily activities in support of his credibility finding. (R. 19.) As Plaintiff notes, a report of activities engaged in early in the relevant period is not indicative of ongoing abilities. (*See* Doc. 12 at 4-5.) Moreover, ALJ Guida's activity assessment is problematic because he identified activities Plaintiff was "admittedly able to perform" without acknowledging the related limitations she indicated in her function reports and testimony. (R. 19.) For example, the ALJ noted that Plaintiff prepared family meals, did light household chores, drove a vehicle, shopped in stores, attended church services, and attended her daughter's basketball games (R. 19); he did not note that she prepared simple quick meals for her family after resting for several hours and sometimes her son cooked (R. 46, 179, 221), her children helped with household chores (R. 170, 221, 225), she spent one to six hours a week doing chores (including groceries) (R. 170), she got groceries every week to two weeks and her son usually helps (R. 221, 225), and she went to church on Sundays when she felt good (R. 221). Although ALJ Guida found Plaintiff's abilities inconsistent with her allegations that she could walk no more than two blocks, could not move about because of constant all-over pain, and needed to lie down six hours a day, the limited manner in which Plaintiff engaged in the identified activities does not support the inherent inconsistency found.

Even if the record did not support precise limitations claimed

28

by Plaintiff, the ALJ must provide substantial evidence for his conclusion that Plaintiff's limitations allow her to engage in light work performing all postural activities except climbing ladders, ropes, or stairs, and all nonexertional activities except the limitation to occasional overhead reaching with her right extremity (R. 15). The Court cannot conclude he has done so with his selective activity review, particularly in that ALJ Guida specifically states that Plaintiff's "admitted abilities provide support, in part, for the residual functional capacity set forth." (R. 19.)

Perhaps more importantly, the ALJ did not adequately address the effects of Plaintiff's fibromyalgia-related pain which Dr. Trostle opined rendered Plaintiff incapable of even low stress jobs and limited her functional abilities. (R. 557-60.) To the extent the Court has concluded the ALJ's assessment of Dr. Trostle's opinions were not supported by substantial evidence, reconsideration of the symptom support provided by the opinions is warranted on remand.

Finally, the need for a thorough review of the record on remand, particularly Dr. Trostle's records and the effects of Plaintiff's severe impairment of fibromyalgia on her ability to engage in substantial gainful activity, is evidenced by ALJ Guida's statement that his finding that "the medical records support the limitations found . . . in the residual functional capacity . . .

rendering the claimant's allegations of debilitating pain and fatigue and resulting functional limitations less persuasive." (R. 18.) The ALJ's reasoning is flawed in that the RFC should be the *result* of his assessment of Plaintiff's allegations regarding pain and fatigue; his assessment of these allegations should not flow from a pre-established RFC. *See Fell v. Astrue*, Civ. A. No. 3:12-CV-275, 2013 WL 6182041, at *11 (M.D. Pa. Nov. 25, 2013); *see also Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012) (listing cases).

## V. Conclusion

For the reasons discussed above, the Court concludes this matter must be remanded to the Acting Commissioner for further consideration consistent with this opinion. An appropriate Order is filed simultaneously with this Memorandum.


                                    S/Richard P. Conaboy
                                    RICHARD P. CONABOY
                                    United States District Judge

DATE: October 2, 2018